UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

RICKY DALE HENSLEY                    )
                                      )
V.                                    )          NO. 2:14-CV-378
                                      )
CAROLYN W. COLVIN,                    )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders

of the Court and 28 U.S.C. § 636 for a report and recommendation. The plaintiff's

application for supplemental security income under the Social Security Act was denied by

the Commissioner following an administrative hearing before an Administrative Law

Judge ["ALJ"]. This is a judicial review of that adverse decision. Plaintiff and the

defendant Commissioner have both filed Motions for Summary Judgment [Docs. 11 and

15].

The sole function of this Court in making this review is to determine whether the

findings of the Commissioner are supported by substantial evidence in the record.

*McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir.

1988). ΑSubstantial evidence@ is defined as evidence that a reasonable mind might

accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402

U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to

direct a verdict when the conclusion sought to be drawn is one of fact for the jury.

*Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try

the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility.

*Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, Aa decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 52 years of age when he filed his application for supplemental security income on January 4, 2012. He is presently 56 years old. He has a high school education. There is no dispute that he is incapable of performing his past relevant work.

Plaintiff's medical history is set forth in his brief as follows:

> Mr. Hensley has received treatment at the Nolachuckey Holston Area Mental Health Center for panic disorder, anxiety disorder, and depression since at least April 28, 2005 (Tr. 1382). On November 10, 2011, Mr. Hensley was seen at a visit with treating psychiatrist, Narayanan Ittamveetil Kutty, M.D. (Tr. 880). He stated that Mr. Hensley's condition was unchanged from prior visits and he continued to "worry excessively," dwell over issues repeatedly, and had difficulty sleeping. A mental status examination revealed an anxious mood and a slightly decreased range of affect. Dr. Kutty prescribed Remeron and continued Seroquel, Trazodone, and Wellbutrin. *Id.*
> On December 20, 2011, Mr. Hensley returned to Dr. Kutty for disturbed sleep and feeling increasingly depressed and anxious (Tr. 877). His brother had passed away one week earlier. A mental status examination revealed intermittent eye contact, an anxious mood, a decreased range of affect, and lack of insight. *Id.* Dr. Kutty added Diazepam to his other medications (Tr. 878). On April 17, 2012, Dr. Kutty noted that Mr. Hensley had missed several psychiatric appointments and therapy visits with David Brown (Tr. 1256). However, he had obtained his medications, except for Seroquel because he could not afford the co-pay. A mental status examination revealed an anxious mood with a congruent

2

affect. *Id.*

On June 12, 2012, Dr. Kutty completed a Psychiatric/Psychological Impairment Questionnaire (Tr. 1288-1295). The doctor reported treating Mr. Hensley for panic disorder without agoraphobia, anxiety disorder, and depressive disorder (Tr. 1288). His GAF score was 55 and his prognosis was poor. *Id.* Clinical findings included appetite disturbance with weight change, sleep disturbance, recurrent panic attacks, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, blunt, flat, or inappropriate affect, decreased energy, and generalized persistent anxiety (Tr. 1289). Mr. Hensley's primary symptoms were anxiety, worry, irrational fears, being "on edge," irritability, and panic (Tr. 1290). Dr. Kutty opined that his symptoms and limitations began in 1996 (Tr. 1295).

Dr. Kutty opined that Mr. Hensley was markedly limited (defined as effectively precluded) in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance (Tr. 1291). He was moderately limited (defined as significantly effected but not completely precluded) in the ability to understand and remember work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and, to set realistic goals or make plans independently (Tr. 1291-1293).

Mr. Hensley experienced episodes of deterioration or decompensation in work or work like settings because of anxiety and/or panic attacks that caused him to flee or avoid situations (Tr. 1293). Additionally, he had difficulty maintain focus and concentration when under pressure, which Dr. Kutty rated as 9 on a 10-point scale. *Id.* Dr. Kutty opined that Mr. Hensley was not a malingerer (Tr. 1294). Mental stress increased his physical pain. Mr. Hensley was only capable of tolerating low stress work, "unless he gets worried or frightened." He had good and bad days. *Id.* Mr. Hensley would be absent from work more than three times a month (Tr. 1295)

On July 10, 2012, Mr. Hensley stated that he was under considerable stress and felt overwhelmed (Tr. 1334). A mental status examination revealed an anxious mood and a broad range of affect. *Id.* On July 27, 2012, Plaintiff was seen by Mr. Brown for a psychological assessment (Tr. 1365). He diagnosed panic disorder without agoraphobia, anxiety disorder, depressive disorder, and a history of alcohol abuse years ago. Mr. Hensley's psychosocial and environmental problems included social isolation, unemployment, living with his parents, no income, and no health insurance. His GAF score was 55. *Id.* He also had

3

impulsive and dependent behaviors, a history of non-compliance, self-sabotaging patterns, and inadequate leisure and recreation (Tr. 1365-1366).

On March 15, 2013, Mr. Brown completed a narrative wherein he reported that Mr. Hensley had been under treatment for "an extended period" for anxiety disorder, panic disorder, and depressive disorder (Tr. 1140). Despite treatment with psychotropic medications and consistent attendance at therapy, Mr. Hensley continued to experience panic attacks, which interfered with his ability to function normally. He experienced a "constant state of anxiety" that disrupted his activities of daily living, as well as ongoing episodes of depression that caused isolation and increased anxiety. Mr. Brown opined that Mr. Hensley's condition interfered with "his ability to maintain gainful employment because he would be absent from work more than 10 days a month." Moreover, Mr. Hensley would lose his ability to focus and concentrate on tasks when under pressure and around others. His "mental conditions would interfere with his ability to communicate well with others and disrupt any type of residual work related activity." *Id.*

On April 23, 2013, Mr. Hensley stated that he was "stable" on his medication regimen and his condition had improved (Tr. 1444). A mental status examination revealed some abnormal mannerisms. *Id.* However, by July 12, 2013, Mr. Hensley felt increased depression (Tr. 1442). A mental status examination revealed a depressed mood and a congruent affect. *Id.* His dose of Seroquel was increased (Tr. 1443).

On December 4, 2011, Mr. Hensley was admitted to the hospital with complaints of worsening epigastric and right upper quadrant abdominal pain for 7 days (Tr. 866-867). An examination revealed diffuse abdominal tenderness, worse in the epigastric and right upper quadrant region. Mr. Hensley was diagnosed with an acute flare of chronic pancreatitis. He was treated with Dilaudid, Zofran, and Protonix. *Id.* On that date, a CT scan of the abdomen and pelvis with contrast revealed stable chronic pancreatitis and significant dilation of the pancreatic duct, significant varices within the upper abdomen to include within the cardia of the stomach, and borderline splenomegaly (Tr. 875). Mr. Hensley was discharged on December 6, 2011 (Tr. 857-858). He was prescribed Omeprazole, Lisinopril, Wellbutrin, Celexa, Trazodone, Seroquel, and MS Contin (Tr. 857).

On December 16, 2011 and December 20, 2011, Mr. Hensley was evaluated in the emergency room for chronic abdominal pain (Tr. 893, 896). On December 16, 2011, he was prescribed Reglan (Tr. 901). On December 21, 2011, Mr. Hensley was admitted to the hospital for abdominal pain (Tr. 910-913). He was diagnosed with a diagnosis of chronic pancreatitis (Tr. 912). He was treated and discharged on December 22, 2011 with diagnoses of chronic pain secondary to chronic pancreatitis, chronic benzodiazepine use, and chronic narcotic use (Tr. 907-908). Mr. Hensley was prescribed Oxycodone, Valium, and Morphine. He was instructed to establish care with a primary physician. *Id.* On December 28, 2011, Mr. Hensley was evaluated in the emergency room for abdominal pain, chronic pain, hepatitis, opiate dependence, and chronic pain management (Tr.

4

916-923). On that date, an ultrasound of the gallbladder revealed intrahepatic biliary ductal dilation, and nonspecific coarsening to the hepatic parenchyma, calcifications within the partially visualized pancreatic parenchyma consistent with prior pancreatitis (Tr. 930).

On December 30, 2011, Mr. Hensley was evaluated by D. Brent Welch, M.D., for follow up of chronic relapsing pancreatitis (Tr. 991). The doctor noted that he also had a long history of chronic abdominal discomfort. Dr. Welch diagnosed chronic pancreatitis and referred Mr. Hensley for long-term pain management and routine medical follow up with a primary care physician. *Id.* On December 31, 2011, Mr. Hensley was again evaluated the emergency department for abdominal pain (Tr. 1007-1009). He was diagnosed with acute exacerbation of chronic abdominal pain and drug seeking (Tr. 1009). On January 1, 2012, Mr. Hensley was evaluated in the emergency department for abdominal pain (Tr. 1003-1005). He was diagnosed with acute exacerbation of abdominal pain and prescribed Tramadol21 (Tr. 1005).

On January 16, 2012, Mr. Hensley was again evaluated in the emergency room for abdominal pain (Tr. 998-1001). It was noted that he had lost 22 pounds since November. He stated that he had not been eating secondary to his abdominal pain (Tr. 998). He was diagnosed with acute exacerbation of chronic abdominal pain and history of pancreatitis (Tr. 1000). On January 23, 2012, Mr. Hensley was seen again in the emergency room due to abdominal pain (Tr. 993-996). He was diagnosed with acute exacerbation of chronic pain and prescribed Acetaminophen (Tr. 996).

On January 4, 2012, Mr. Hensley established care with Crystal Dyer, M.D. (Tr. 1272). He stated that he had chronic moderate-severe abdominal pain resulting from pancreatitis. *Id.* An examination revealed epigastric abdominal tenderness (Tr. 1273). Dr. Dyer diagnosed chronic persistent pancreatitis and esophageal varices (Tr. 1273-1274). The doctor noted that Mr. Hensley required chronic pain management given his frequent emergency room visits for pain control. However, he did not have insurance. *Id.* On February 2, 2012, Mr. Hensley returned to Dr. Dyer for follow up and medication review (Tr. 1269). The doctor noted that he had been previously prescribed "short acting narcotics." *Id.* Dr. Dyer added long acting Morphine with Roxicodone for baseline pain control and breakthrough/flare pain (Tr. 1270). On February 28, 2012, Mr. Hensley stated that he had sharp, constant epigastric pain (Tr. 1266). An examination revealed epigastric abdominal tenderness (Tr. 1267). On February 28, 21012, Mr. Hensley was evaluated in the emergency room for abdominal pain (Tr. 1282). An examination revealed mild abdominal tenderness (Tr. 1283). He was prescribed Lortab (Tr. 1285). On March 1, 2012, Mr. Hensley stated that he had "aching, bloating, sharp, and stabbing" abdominal pain (Tr. 1263). Dr. Dyer advised he should not take excess medications, even when having an acute flare (Tr. 1264).

In a letter dated April 9, 2012, Dr. Dyer reported treating Mr. Hensley for a history of chronic pancreatitis and esophageal varices related to a history of

alcohol abuse (Tr. 1255). He also had a history of anxiety and depression, "exacerbated by his need for frequent medical care." Mr. Hensley had numerous emergency room visits for flares of pancreatitis, as well as 2-3 hospitalizations within the previous 12 months. He required chronic narcotic medication for pain control. Dr. Dyer opined that Mr. Hensley "would be unable to hold a regular job due to his frequent recurrences of pancreatitis." Additionally, the doctor was concerned about his ability to work safely with the amount of pain medication he was currently taking. *Id.*

On April 21, 2012, Mr. Hensley was evaluated in the emergency room for nausea, vomiting, diarrhea, and abdominal pain for three days (Tr. 1279). An examination revealed mild generalized abdominal tenderness (Tr. 1280). Mr. Hensley was diagnosed with abdominal pain, acute hypokalemia, and an acute urinary tract infection (Tr. 1281). He was prescribed Phenergan and Dilaudid. *Id.* On April 27, 2012, Mr. Hensley was seen at a follow up visit with Dr. Dyer (Tr. 1260-1261). The doctor reported that she would no longer prescribe Plaintiff narcotic medications and he would have to establish care with a pain management clinic (Tr. 1261). On May 14, 2012, Mr. Hensley was yet again evaluated in the emergency room for upper abdominal and mid-epigastric pain (Tr. 1275). He was diagnosed with chronic pancreatitis (Tr. 1278). On July 8, 2012, Mr. Hensley returned to the emergency room for abdominal pain with nausea (Tr. 1322). He was diagnosed with epigastric pain, nausea, and constipation (Tr. 1326).

On March 16, 2013, Mr. Hensley was evaluated in the emergency room for abdominal pain with vomiting and diarrhea (Tr. 1431). He was diagnosed with epigastric pain, nausea, chronic pancreatitis, and recurrent pancreatitis (Tr. 1435). Mr. Hensley was prescribed Percocet, Lactulose, Colace, and Reglan. *Id.* Three days later, Mr. Hensley returned to the emergency room and stated that his condition had not improved (Tr. 1426). An examination revealed moderate left upper quadrant epigastric tenderness (Tr. 1427). Mr. Hensley was diagnosed with abdominal pain, hepatitis, pancreatitis, and urinary tract infection. *Id.* He was prescribed Percocet and Reglan (Tr. 1429). The next day, on March 20, 2013, Mr. Hensley was evaluated in the emergency room for rectal bleeding (Tr. 1404). An examination revealed mild distress, epigastrium tenderness, and a palpable internal hemorrhoid with scant bloody stool (Tr. 1405). Mr. Hensley was diagnosed with rectal bleeding and recurrent pancreatitis (Tr. 1406). On March 26, 2013, a CT scan of the abdomen and pelvis revealed an abnormal pancreatic head with a cystic appearance, calcifications and diffuse calcification of the pancreas, likely representing chronic pancreatitis, increasing dilation of the main duct, and associated posterior penetrating peptic ulcer disease in the gastric antrum (Tr. 1407-1408).

On June 6, 2012, Mr. Hensley established care with Kenneth Nickle, D.O.31 (Tr. 1296). He stated that he had significant pain from chronic pancreatitis. *Id.* An examination revealed direct epigastric tenderness and tenderness in the right and left upper quadrant of the abdomen (Tr. 1298). Dr. Nickle diagnosed chronic infectious pancreatitis. The doctor prescribed

6

Oxycodone. *Id.* On June 19, 2012, Mr. Hensley returned to Dr. Nickle for follow up (Tr. 1309). The doctor diagnosed esophageal varices and added Metoprolol to Mr. Hensley's other medications (Tr. 1312). On August 16, 2012, Mr. Hensley stated that his psychiatrist had left the facility and he had begun treating with mental health practitioner Karen Lane (Tr. 1356). However, he had not been prescribed any psychiatric medications. *Id.* Dr. Nickle diagnosedbinsomnia, chronic infectious pancreatitis, and anxiety disorder (Tr. 1358). Mr. Hensley was prescribed Quetiapine (Seroquel), Trazodone, and Diazepam. *Id.* On October 16, 2012, Dr. Nickle added Bupropion to Mr. Hensley's other medications (Tr. 1353-1355).

On October 22, 2012, Mr. Hensley was evaluated in the emergency room for abdominal pain (Tr. 1389). He was diagnosed with acute exacerbation of chronic abdominal pain and drug seeking (Tr. 1391). Mr. Hensley was prescribed Tramadol. *Id.* Two days later, Mr. Hensley was evaluated in the emergency room for abdominal pain and nausea (Tr. 1384). He was diagnosed with chronic abdominal pain and chronic pain issues (Tr. 1386). On October 31, 2012, Mr. Hensley was seen at a follow up of a recent emergency room visit for worsening chronic pancreatitis (Tr. 1350). An examination revealed direct epigastric tenderness and a tired appearance (Tr. 1352). Dr. Nickle prescribed Hydrocodone-Acetaminophen and Welchol. *Id.*

On January 29, 2013, Dr. Nickle completed a Multiple Impairment Questionnaire (Tr. 1392-1399). The doctor diagnosed chronic pancreatitis, anxiety, and esophageal varices (Tr. 1392). Clinical and diagnostic findings included epigastric tenderness and a history of elevated pancreatic enzymes. *Id.* Mr. Hensley's primary symptoms were abdominal pain precipitated by eating and anxiety (Tr. 1393-1394). Dr. Nickle rated his pain as moderately severe to severe, 8-9 on a 10 point scale, and his fatigue as moderately severe, 8 on a 10 point scale (Tr. 1394).

Dr. Nickle opined that in an 8-hour workday, Mr. Hensley could sit for 1 hour total, stand/walk for 1 hour total, and must get up every hour when sitting and move around for 10 minutes before sitting again (Tr. 1394-1395). He could occasionally lift up to 20 pounds and carry up to 10 pounds (Tr. 1395). He had significant limitations doing repetitive lifting, because it might exacerbate his pain. *Id.* He was moderately limited in the ability to use the arms for reaching, including overhead movements (Tr. 1396). Mr. Hensley's symptoms were frequently severe enough to interfere with his attention and concentration (Tr. 1397). Anxiety and depression contributed to the severity of his symptoms and functional limitations. Mr. Hensley would need to take frequent unscheduled breaks to rest at unpredictable intervals during an 8-hour workday, lasting at least 30 minutes and up to 4 hours. *Id.* He had good and bad days (Tr. 1398). Mr. Hensley was likely to be absent from work more than three times a month. *Id.*

On October 20, 2012, Dr. Lawhon evaluated Mr. Hensley at the request of the Social Security Administration (Tr. 1336-1343). A mental status examination revealed an anxious and depressed mood and affect, and a low average range of

7

intellectual functioning (Tr. 1337-1338). Dr. Lawhon also administered psychological testing (Tr. 1338-1339). Mr. Hensley scores on the Wechsler Adult Intelligence Scale revealed low average intellectual abilities and a full scale IQ score of 85. The results of the Wechsler Memory Scale revealed extremely low scores in both visual and delayed memory, "suggesting mild to moderate memory impairment." *Id.* Dr. Lawhon diagnosed depressive disorder (Tr. 1339). Mr. Hensley's GAF score was 58. *Id.* The doctor opined that Mr. Hensley was moderately limited in the ability to sustain concentration and persistence and mildly to moderately limited with regard to work adaptation (Tr. 1340). The doctor opined that he was not significantly limited in the ability to understand and remember and with social interaction. *Id.*

[Doc. 12, pgs. 2-12].

Plaintiff's records were also examined by State Agency psychologist Dr. Theren Womack, Ph.D., on March 23, 2012. Dr. Womack stated that plaintiff had been diagnosed with panic and anxiety disorders, and had a history of prior alcohol dependence (Tr. 1219, 1222). Dr. Womack stated that the plaintiff had mild limitations in activities of daily living. He had moderate difficulties with regard to social functioning. Dr. Womack opined that the plaintiff had no difficulties with concentration, persistence or pace, and had not experienced any episodes of decompensation (Tr. 1224). He noted that plaintiff's reporting of life events was not consistent. In this regard, he stated that plaintiff had indicated in 2011 that he had stopped drinking alcohol in 1999, but had been diagnosed with delirium, possibly secondary to alcohol withdrawal in 2009. (Tr. 1226).

Dr. Womack stated in his Mental RFC Assessment that plaintiff was moderately limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness and in his ability to respond appropriately to changes in the work setting. (Tr. 1229) In the other 18 areas of mental functioning Dr.

8

Womack opined the plaintiff had no significant limitations. *Id.* Dr. Womack's evaluation was affirmed at the reconsideration level by another State Agency psychologist, Dr. Currey (Tr. 1307).

In respect to an earlier unsuccessful application for Social Security benefits, the plaintiff was consultatively examined by Dr. Bruce Berry on March 18, 2010. Dr. Berry noted the diagnosis and treatment of the plaintiff for pancreatitis (Tr. 801-02, 806). He stated that plaintiff advised him that he had stopped drinking one year before the examination, but Dr. Berry noted that the plaintiff had been treated for delirium tremens in 2008 and 2009 (Tr. 802-804). He also noted that the plaintiff's medical records indicated that an earlier treating doctor had discharged plaintiff from his practice due to strong drug seeking behavior (Tr. 804). Based upon his exam and the other records he examined, Dr. Berry opined that the plaintiff had no "medical indication for physical restrictions or limitations" at that time (Tr. 806).

A State Agency physician, Dr. Karla Montague-Brown, examined plaintiff's records as part of that earlier proceeding, and found no severe impairment. She stated that "[t]he claimant appears to be inconsistently compliant in following prescribed treatment and/or taking medication which have brought on acute pancreatitis episodes at times." (Tr. 565).

In connection with the present application for benefits, the plaintiff's records were reviewed by Dr. Anita Johnson, another State Agency non-examining physician, on March 29, 2012. She opined that the plaintiff could lift or carry 20 pounds occasionally

9

and 10 pounds frequently, could stand or walk for six hours, and sit for six hours in an eight area work day. She also stated plaintiff had no other physical limitations (Tr. 1239-1242). On July 4, 2012, with more intervening medical evidence submitted, including Dr. Dyer refusing to give plaintiff any more narcotics due to plaintiff's drug seeking behavior, Dr. Johnson's opinion was concurred in by another State Agency physician, Dr. Carolyn Parrish (Tr. 1314).

The ALJ conducted an administrative hearing on April 2, 2013. At the administrative hearing, he took the testimony of Dr. Robert Spangler, a vocation expert ["VE"]. The ALJ asked Dr. Spangler to assume a person of plaintiff's age, vocational history, and education who had the physical capacity set out by Dr. Womack, which was the ability to perform light work. When asked if there were any jobs, Dr. Spangler identified 8,923,517 in the nation and 188,140 in Tennessee which such a person could perform (Tr. 57-58). The ALJ then asked the VE what jobs would be available for a person who also had the degree of mental limitation opined by Dr. Lawhon in his consultative examination (Tr. 1336-1343). The VE stated that those moderate limitations would have no impact on the number of jobs (Tr. 58-59).

On May 23, 2013, the ALJ rendered his hearing decision. He first described the sequential evaluation process he must follow in analyzing plaintiff's claim. He noted that at step three of the process where he must determine the plaintiff's residual functional capacity ["RFC"], he must consider the effects of all of plaintiff's impairments, regardless of whether he found them to be severe or non-severe (Tr. 28). He then found that the

plaintiff had a severe impairment of chronic pancreatitis (Tr. 29). He then discussed the opinion of Dr. Kutty, the plaintiff's treating psychiatrist, and Dr. Lawhon who performed the consultative examination at the behest of the Commissioner. He then stated that he found that the plaintiff's mental impairments imposed no more than a minimal limitation on the plaintiff's ability to perform basic mental work activities. He therefore found that the plaintiff's mental impairments did not meet the standard under the regulations to be considered severe (Tr. 29-30). He then stated his opinion regarding the degree of limitation imposed in the four functional areas known as the "paragraph B criteria." (Tr. 30). He found that the plaintiff had mild limitations in regard to his activities of daily living, social functioning and in maintaining concentration, persistence or pace. He also found the plaintiff had not had episodes of decompensation of extended duration. *Id.* He stated that he would be required to give "a more detailed assessment" of the effects of plaintiff's mental impairment, even though it was non-severe, further on in the sequential evaluation process (Tr. 31).

He then described in detail the reasons for finding the plaintiff's mental impairments to be non-severe. These included the fact that plaintiff had not required hospitalization for a mental health issue, the plaintiff's ability to act in his own interest, perform ordinary activities and his "generally good response to therapy and medications" set out in the treatment records (Tr. 31). He then discussed the specific records relating to the plaintiff's mental impairment. He first noted that the State Agency psychologists had opined that the plaintiff had moderate limitations in social interaction, but that he

11

found no more than a mild limitation based on the clinical evidence and the lack of evidence of interpersonal problems with former supervisors or co-workers. He therefore assigned them "some weight." *Id*. He then discussed the degrees of limitations in various functions opined by Dr. Kutty. He found them "overly restrictive and clearly not supported by their own clinical findings and total case record." (Tr. 31-32).

After finding that the plaintiff did not meet any of the listing of impairments in 20 CFR Part 404, Subpart P, Appendix 1, the ALJ proceeded to state the plaintiff's RFC. He found that he had the residual functional capacity to perform the full range of light work (Tr. 32). In this context, he indicated that it was necessary to opine as to the credibility of the plaintiff in describing his symptoms. *Id*.

He first recounted the plaintiff's testimony. He stated plaintiff complained of the pain from his pancreatitis which often caused him to be bedfast. He noted that plaintiff said he would have an acute pancreatitis attack every four to six weeks requiring him to go to the emergency room. Plaintiff described his constant pain, and that anything could trigger an attack. He said he had been treated by the Nolachuckey Mental Health Center for over 20 years with anxiety and panic disorder. Regarding all of this, the ALJ stated that he found that plaintiff's statements regarding his symptoms were not entirely credible. (Tr. 33).

In this regard, he discussed plaintiff's medical records. First, he stated that the medical record showed "a long history of alcoholic pancreatitis, chronic pancreatitis, pseudocysts and a pancreatic mass." This led to numerous recorded visits to the

emergency room. However, the ALJ noted that on all occasions the plaintiff had been treated conservatively and discharged in stable condition. *Id*.

He continued his analysis of plaintiff's credibility by discussing the treatment by Dr. Dyer. Dr. Dyer noted "that she had issues with the claimant taking his medications correctly and that he received narcotics from another provider" while she was treating him. She noted frequent emergency room visits for pancreatitis pain "and at least two or three hospitalizations for the same within the past 12 months." He noted she had said plaintiff would be unable to hold a regular job due to his frequent bouts of pancreatitis. (Tr. 33-34). He spoke of Dr. Nickles' treatment of plaintiff who rated plaintiff's "level of pain as eight to ten and his level of fatigue as eight to ten." He discussed the plaintiff's hospitalization in December 2011 for abdominal pain. He noted the record showed the plaintiff's abdominal pain resolved and his pancreatic enzymes went back to normal. Plaintiff was strongly advised about smoking and alcohol cessation as well as dietary modification. He was discharged on December 6, 2011 in stable condition. *Id*.

The ALJ noted that the plaintiff did not have evidence of weight loss with his pancreatitis and had even been told to lose weight. He also mentioned that plaintiff's treating sources did not place restrictions on him in their treatment notes. *Id*.

The ALJ then spoke of the evidence "throughout the record" of plaintiff's drug seeking behavior. He spoke of the ER personnel advising plaintiff he would not be given narcotics and the plaintiff becoming angry. He mentioned that Dr. Dyer told plaintiff he needed to find another health care provider because she would no longer

13

prescribe controlled substances for him. Plaintiff was noted by the ALJ to continue to smoke and that "[s]uch evidence significantly diminishes the claimant's credibility." (Tr. 34-35).

The ALJ then stated that State Agency medical doctors were given great weight because they were well supported by the record and imaging studies. He gave little weight to Dr. Nickle's opinion. Dr. Nickle opined that the plaintiff was seriously limited in standing and walking and would need unscheduled breaks of from thirty minutes to four hours and would miss more than three days a month of work. However, the ALJ stated the only remarkable finding in Dr. Nickel's records was epigastric tenderness, and that Dr. Nickle found that the plaintiff did not appear in acute distress and that his condition was stable. He gave Dr. Nickle's opinion little weight. He gave Dr. Dyer's opinion that the plaintiff could not hold a job with his frequent recurrences of pancreatitis because it was on an issue reserved to the Commissioner and was not supported by the objective evidence (Tr. 35).

The ALJ found at step four that the plaintiff could not return to his past relevant work (Tr. 35). He then discussed the Medical-Vocational Guidelines [the "Grid"], and found that a person of plaintiff's age, past work experience, and education who could perform the full range of light work would be "not disabled" under Rule 202.14. Alternatively, the ALJ stated that the VE had opined that there were a significant number of jobs a person with the mental limitations described in Dr. Lawhon's assessment could perform. Accordingly, the ALJ found that the plaintiff was not disabled.

14

Plaintiff asserts that the ALJ erred in three critical respects, which he asserts require at least a remand to the Commissioner. First, plaintiff asserts that the ALJ erred by failing to find that the plaintiff suffers from a severe mental impairment. Second, he maintains that the ALJ did not properly weigh the medical evidence relating to his chronic pancreatitis in formulating his RFC finding. Third, he argues that the ALJ erred in finding that he was not completely credible.

### 1.    Severe Mental Impairment:

As the plaintiff points out, at step two of the sequential analysis, an impairment is non-severe only if causes no more than a *de minimis* limitation on basic work activities. *See, Bowen v. Yuckert*, 482 U.S. 137, 158 (1987). However, it is also true that, since the ALJ found that the plaintiff's chronic pancreatitis was severe, the evaluation process proceeded, and that as a part of the step three analysis, the ALJ is required to determine the plaintiff's RFC. Both the regulations at § 416.945(a)(2) and Social Security Ruling ["SSR"] 96-8p require *all* impairments to be considered in formulating the RFC, whether severe or not.

There is a perceived problem, however, with the ALJ's treatment of the plaintiff's mental impairments. The ALJ, in determining plaintiff's level of severity in the mental functional areas set out in 20 C.F.R. § 416.920a, found nothing more than mild impairments in either activities of daily living, social functioning, or in maintaining concentration, persistence or pace. The difficulty lies in the fact that all of the examining and non-examining psychiatrists and psychologists found that the plaintiff

suffered from at least a moderate limitation of functioning in one or more of these areas. The ALJ accorded no more than some weight to any of their opinions, and specifically disagreed with their findings of plaintiff having at least a moderate limitation in some area of mental functioning. When he found that the plaintiff did not have a severe mental impairment, he did not include any degree of mental limitation in his RFC finding.

The Court agrees with the plaintiff that the ALJ was not free to simply disregard *every* mental health professional's opinion. Also, his failure to do so would call into question his step five determination that the plaintiff was capable of performing a significant number of jobs from a mental standpoint. The ALJ is very knowledgeable in Social Security law. However, he is not a medical expert. *See, Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1983), *Meece v. Barnhart*, 192 Fed. Appx. 456, 465 (6th Cir. 2006).

That being said, the Court is also aware that the ALJ asked Dr. Spangler, the VE, if there were jobs which the plaintiff could perform if he had that level of mental functioning ascribed to him by Dr. Lawhon, the consultative mental health examiner. Dr. Spangler opined that the number of light jobs he identified at the light level would not be diminished with the moderate limitations set out by Dr. Lawhon. Accordingly, if Dr. Lawhon's opinion is entitled to be considered as substantial evidence, then the failure of the ALJ to find that the plaintiff had a severe mental impairment would not matter. The issue then becomes whether the ALJ erred in his analysis of the opinions of Dr. Kutty, the plaintiff's treating psychiatrist, and in the weight he gave to his opinion.

16

Dr. Kutty's opinion, as is true with any treating source, is only entitled to controlling weight if it is well-supported by clinical and diagnostic techniques and is not inconsistent with other substantial evidence of record. *See*, 20 C.F.R. § 416.927(c). An ALJ may refuse to accept all or part of the opinion of a treating source if he or she gives good reasons for the weight he assigns. *Allen v. Comm'r of Soc. Sec*, 561 F.3d 646, 651 (6th Cir. 2009).

The ALJ's hearing decision indicates that he was very familiar with Dr. Kutty's treatment notes as well as his opinions (Tr. 29, 31-32). After recounting the contents of the Impairment Questionnaire completed by Dr. Kutty and David L. Brown, LPC (Tr. 1288-1295), the ALJ stated that their jointly-signed opinion was "overly restrictive and clearly not supported by their own clinical findings and total case record." (Tr. 32). This statement, in and of itself, is rather terse. However, it must be considered in the context of the entire hearing decision. The treatment records of Dr. Kutty and Mr. Brown indicate a person with a severe mental impairment. However, after reviewing every one of them, as did the ALJ, they do not support limitations of the magnitude contained in the Impairment Questionnaire. The plaintiff's medications were working well at managing his symptoms. Also, a great many of his complaints were about his physical problems due to his chronic pancreatitis.

Dr. Kutty's and Mr. Brown's opinions that the plaintiff has a marked level of limitations in the ability to complete a normal work week without interruptions from psychologically based symptoms, to perform at a persistent pace, in the ability to perform

activities without a schedule, and to maintain attendance seem to indicate a much greater level of restriction than the treatment notes themselves. The form defines marked limitation as effectively precluding the plaintiff from performing these activities. They certainly cannot be readily reconciled with the plaintiff's activities. Also, the opinion of Dr. Lawhon, based upon his examination and diagnostic testing, appears to the Court to be more in keeping with the degree of functionality described in the treatment notes of Kutty and Brown than does their Impairment Questionnaire.

The Court recognizes that the ALJ did not ascribe the weight to the opinion of Dr. Lawhon in his hearing decision that is discussed here. However, he considered it to the degree that he included it in his question to the VE and in his alternative finding based on that question. The plaintiff does have a severe mental impairment, but the error in not so finding was cured by the inclusion of Dr. Lawhon's opinion in the question to the VE. Also, the ALJ properly considered and weighed the opinion of Dr. Kutty and Mr. Brown.

### 2. RFC finding:

Plaintiff asserts that the ALJ erred in his RFC finding that the plaintiff could perform a full range of light work. Instead, plaintiff asserts that the ALJ erred by accepting and giving great weight to the State Agency non-examining physicians as opposed to Dr. Dyer, and in ignoring the opinion of Dr. Nickle.

Plaintiff has had a sizeable number of treating physicians for his chronic pancreatitis. These include Dr. Claes Svendsen, Dr. L. Del Bailey, Dr. Crystal Dyer, and Dr. Kenneth Nickle. One by one, the patient/physician relationship eventually

18

ended, either due to confirmed or suspected narcotic seeking behavior of the plaintiff. This will be discussed in addressing the ALJ's findings regarding plaintiff's credibility.

On April 9, 2012, shortly before Dr. Dyer's treatment relationship with the plaintiff ended, Dr. Dyer wrote a letter addressed "to whom it may concern." She stated that the plaintiff had a history of chronic pancreatitis and esophageal varices related to a history of alcohol abuse. She stated he had numerous ER visits for flares of pancreatitis, and "at least 2 or 3 hospitalizations for the same within the past 12 months." She stated he was on "chronic narcotic medication for control of his pain." She opined that plaintiff "would be unable to hold a regular job due to his frequent recurrences of pancreatitis." She also expressed "grave concerns about Mr. Hensley's ability to work safely given the amounts of pain medication he states he requires." (Tr. 1255). In all, she treated the plaintiff from January 4 to April 27, 2012.

The ALJ gave little weight to Dr. Dyer's opinion for two stated reasons. First, he properly noted that that her opinion that plaintiff could not hold a regular job due to his regular recurrences of pancreatitis was an issue reserved to the Commissioner. Second, he stated that the opinion was also not supported by the record due to the fact that the only abnormal physical finding on examination was epigastric tenderness (Tr. 35).

Plaintiff argues that even if they are not entitled to controlling weight, medical source opinions are still entitled to deference and must be weighed in accordance with 20 C.F.R. § 416.927. All of this would be true if she was giving a medical opinion and not an opinion on whether the plaintiff can hold a regular job. Given the extremely brief

19

relationship, and her somewhat curious statement "about Mr. Hensley's ability to work safely given the amounts of pain medication he states he requires…" (Tr. 1255) as well as the opinion of the State Agency physicians, the ALJ properly assessed the weight he gave to Dr. Dyer. It is true, as plaintiff states, that generally the opinions of examining doctors are given more credence than those of State Agency non-examining doctors. It is also true that the State Agency physicians did not see Dr. Dyer's letter, because they reviewed the extant records and filed their reports before Dr. Dyer wrote it. However, the State Agency physicians were doubtlessly aware of the numerous ER visits and the hospitalizations for chronic pancreatitis that Dr. Dyer's letter referred to. Therefore, Dr. Dyer's statement that plaintiff could not perform a regular job because of his pancreatitis would not have altered their assessment. Therefore, the Court finds that the ALJ was free to evaluate Dr. Dyer's letter and give it what he determined was little weight.

The plaintiff also asserts that the ALJ "completely ignored" the opinion of Dr. Nickle [Doc. 12, pg. 22]. The ALJ considered the opinion (Tr. 1392-1399) quite carefully and found it overly restrictive and not supported by his treatment records. He also had noted epigastric tenderness and some abnormal levels of pancreatic enzymes. However, it is not explained how these would translate into the severe restrictions on standing and walking and lifting set out in Dr. Nickle's questionnaire. Also, Dr. Nickle's records indicate two occasions when plaintiff advised him that he was going to be going to work soon. (Tr. 1350, 1353). The Court cannot disagree with the ALJ's basis for giving Dr. Nickle's opinion little weight. Accordingly, the Court finds that the

20

ALJ properly evaluated the opinions of Drs. Dyer and Nickle and was justified in the weight he gave to the opinions of the State Agency physicians.

### 3. Plaintiff's credibility:

Plaintiff asserts that the ALJ erred in his assessment of plaintiff's credibility.   As plaintiff asserts, the ALJ evaluates credibility under a two-step process.   First, the ALJ determines whether the plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms.   Second, if those impairments have been shown to exist, the ALJ must evaluate the intensity, persistence and limiting effects of the plaintiff's symptoms to determine the extent to which they limit the claimant's functioning.   If the statements are not directly shown to be true by objective medical evidence, the ALJ must make a credibility determination based upon the record.   The ALJ's credibility determination is entitled to substantial deference by a reviewing court. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709-714 (6th Cir. 2012); *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013); and *Stankoski v. Astrue*, 532 F. App'x 61, 619 (6th Cir. 2013).   Nevertheless, the ALJ's credibility finding must contain "specific reasons…supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."   SSR 96-7p.

Plaintiff seems to suggest that the ALJ is required to analyze every factor in SSR 96-7p in making his credibility determination.   However, the seven factors listed in the

21

ruling are only suggestions of "the kinds of evidence…that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements." *Id.* The ALJ need not discuss every one of those factors, or even every factor in the record he may have considered. See, *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 664 (6th Cir. 2004).

The ALJ stated his reasons for finding the plaintiff to be not completely credible as follows:

> The claimant's credibility has been considered. Throughout the record, there is evidence of drug-seeking behavior. The emergency room staff noted that the claimant was well known to the emergency department for seeking care for pain-related issues and abuse of narcotic medications. The claimant became upset when he was told that narcotic medication would not be prescribed due to history. The emergency room staff has also noted that the claimant requests narcotic pain medications and was informed verbally and in writing multiple times that he would not be administered narcotics unless medically indicated. Dr. Dyer expressed her concerns about the claimant's ability to work safely given the amounts of pain medications he states he requires. Dr. Dyer advised the claimant to find another provider as she would no longer be prescribed [sic] him controlled substances. The claimant told Dr. Nickle that he was out of pain medicine and tried to work with a pain clinic but they were difficult so he was looking at another place. The claimant was given a one-month supply of oxycodone. Dr. Nickle stated he would proceed cautiously in light of his concern for his ability to treat the claimant based on significant reported problems and significant pain [sic] usage. The claimant continues to smoke despite repeated medical advice to cease such activity. Such evidence significantly diminishes the claimant's credibility. Based upon the foregoing, the Administrative Law Judge concludes that the claimant's allegations of disabling pain and other disabling symptoms are not supported by the record as a whole.

(Tr. 34-35).

Plaintiff first asserts that the ALJ ran afoul of SSR 96-7p by not heeding its admonition that "the adjudicator must not draw any inferences about an individual's

symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." Plaintiff states that the ALJ was required to consider evidence in the record that plaintiff could not afford appropriate treatment before mentioning plaintiff not having treatment by a pain specialist as a basis to find plaintiff was not credible. The ALJ could certainly consider that the plaintiff's treatment was conservative as opposed to aggressive in nature. The ALJ did not find fault with the plaintiff for not seeking other treatment that he could not afford.

Next, plaintiff argues that the ALJ's statement that plaintiff could "stand, move about, and use his arms, hands, and legs in a satisfactory manner" does not address how the plaintiff could meet the requirements of a full-time job. By itself it does not, but it is certainly relevant to the ALJ's assessments of both the plaintiff's mental and physical abilities. Likewise, as plaintiff states, he does not have to be an invalid to be eligible for benefits, but his activities are once again a part of the mix for the ALJ to consider in determining whether the plaintiff is being completely truthful.

Plaintiff also takes issue with the ALJ's statement that continuing to smoke cigarettes after being told to quit by his doctors significantly diminished plaintiff's credibility. Admittedly, the Court could not initially see any strong connection between smoking and the credibility of a plaintiff suffering from chronic pancreatitis. However, as the defendant points out, Dr. James A. Swenson, who treated plaintiff on July 14, 2009, stated that he "strongly advised discontinuing smoking tobacco *which greatly*

*increases the risk of pancreatic cancer*." (Tr. 721) [emphasis added]. In this context, it is certainly at least suggestive that the plaintiff chooses to ignore some important medical advice which could be interpreted as meaning that he does not have as severe a problem with pancreatitis as he says he does.

Plaintiff's alleged drug seeking behavior influenced the ALJ's credibility judgment of the claimant. This was emphasized by nearly every treating source, and eventually led to several physicians refusing plaintiff further treatment. Dr. Kutty expressed concern about the plaintiff's apparent need to obtain opiates (Tr. 878). Dr. Berry observed that plaintiff had been refused further treatment in 2009 due to his drug-seeking behavior (Tr. 265, 804). Dr. Nickle, on August 16, 2012, reviewed with the plaintiff "multiple narcotic request visits to [Johnson City Medical Center] as reported by Dr. Allen in JCMD [Emergency Department]. Continue *no narcotic therapy from this clinic*…" (Tr. 1359). The Court is aware that Dr. Nickle later, on October 31, 2012, gave the plaintiff "a 30 tab supply of Hydrocodone for severe pain only from this pancreatic problem." (Tr. 1350). However, Dr. Nickle also stated that "it is unclear is [sic] this a seeking habit or is this an uncontrolled pain problem." *Id*. Dr. Dyer, who treated the plaintiff for less than four months, stopped treating the plaintiff shortly after writing the letter discussed above because plaintiff continued to receive drugs from multiple sources. (Tr. 1255, 1260-1261, and 1263-1264).

Plaintiff asserts that "[t]he fact that Mr. Hensley has sought out pain medications repeatedly through the hospital is consistent with evidence that his condition causes

severe pain and his inability to afford regular pain management." [Doc. 12, pg. 24].
Admittedly, this may in fact be true. But no one knows for sure except the plaintiff
himself. The ALJ, as the trier of fact in this case who is charged with determining
credibility, felt that the plaintiff was seeking narcotics beyond what was needed to control
his pain. That is a legitimate point for the ALJ to consider. *See, Lawson v. Comm'r of
Soc. Sec.*, 192 F. App'x 521, 528 (6th Cir. 2006); *Hayes v. Astrue*, 2011 WL 1188510
(E.D. Tenn. March 28, 2011).

The Court also notes that drug seeking behavior was not the only area casting
doubt on the plaintiff's credibility. His struggle with alcoholism which contributed to
his pancreatitis was also the subject of suspect assertions. He testified at the hearing that
he had not had a drink since 2000 (Tr. 52). But he was treated for delirium tremens in
*2008* and *2009* (Tr. 438). He even admitted to Dr. Kutty that he had consumed alcohol
with his girlfriend in June 2011 (Tr. 883).

It is also noted that the plaintiff told Dr. Lawhon that he had been sober since
1999, but, *in the same interview*, stated he had been arrested twice for DUI (Tr. 1337).
He told Dr. Lawhon he had lost his driver's license because of a DUI in 2005. A
factfinder often cannot actually know by objective evidence how much pain another
person is in. But in many contexts, factfinders are obliged to make these determinations.
To accomplish this, factfinders have to look to a person's propensity for truthfulness in
other areas. The plaintiff denying that he had consumed alcohol since 2000 and then
being arrested for DUI in 2004, and treated for delirium tremens in 2008 and 2009 is

inconsistent, and it is this sort of inconsistency the ALJ must look to in order to determine if the plaintiff is being truthful when talking about his symptoms. He committed no error in evaluating plaintiff's credibility.

One other bit of evidence recognized as significant by the ALJ is the fact that the plaintiff has maintained his weight in spite of pancreatitis and the acute worrying he claims to suffer from. He is 72 inches tall and weighed 217 pounds. The ALJ noted that he was even advised to lose some weight (Tr. 34). The ALJ insinuates at least that a person with such a debilitating illness as chronic pancreatitis should not be expected to go on a diet and lose weight.

To summarize, any error on the part of the ALJ in failing to find the plaintiff's mental impairments severe was cured by his alternative question to the VE, who found that the plaintiff could perform a significant number of jobs. Also, the ALJ had substantial evidence to support the weight given to plaintiff's treating physicians and psychiatrist. Finally, there is strong evidence to support the ALJ's credibility determination. Accordingly, it is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 11] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 15] be GRANTED.[1]

Respectfully submitted,

s/ Clifton L. Corker
UNITED STATES MAGISTRATE JUDGE

---

[1]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).